# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39470**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Brandon L. SNYDER**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 15 April 2020

————————————

*Military Judge:* J. Wesley Moore (arraignment); Vance H. Spath.

*Approved sentence:* Dismissal, confinement for 6 months, forfeiture of $1,000.00 pay per month for 6 months, and a reprimand. Sentence adjudged 11 January 2018 by GCM convened at Patrick Air Force Base, Florida.

*For Appellant:* Major Benjamin H. DeYoung, USAF; Major Jarett F. Merk, USAF; Donald G. Rehkopf, Jr., Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Zachary T. West, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and POSCH, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Senior Judge MINK and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The conviction concerns Appellant's sexual act upon SB, a female friend of a coworker's daughter.[2] Appellant was sentenced to a dismissal, confinement for six months, forfeiture of $1,000.00 pay per month for six months, and a reprimand. The convening authority approved the sentence as adjudged.

Appellant raises 22 issues on appeal and we consider one additional issue. This opinion addresses 13 assignments of error, nine issues that Appellant personally raises combined as one assignment of error,[3] and one additional issue raised by the court: (1) whether the evidence is legally and factually sufficient to support the conviction; (2) whether the Specification of the Charge fails to state an offense because it fails to allege any *mens rea* element; (3) whether Appellant was denied the right to be represented at trial by retained civilian counsel of choice in violation of the Sixth Amendment;[4] (4) whether Appellant was denied the Sixth Amendment right to a public trial; (5) whether the reasonable doubt instruction the military judge gave was constitutionally defective; (6) whether Appellant was denied the Sixth Amendment right to confront SB after she read an unsworn victim impact statement in presentencing; (7) whether the military judge abused his discretion in precluding Appellant from including attachments to his written unsworn statement in violation of Rule for Courts-Martial (R.C.M.) 1001(c)(1)(B); (8) whether Appellant was deprived of due process and equal protection under the law in violation of the Fifth

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant's sole charge consisted of two specifications in which he pleaded not guilty to both specifications, and was acquitted of the second specification of abusive sexual contact of SB in violation of Article 120, UCMJ, 10 U.S.C. § 920.

[3] Appellant's counsel raised 13 assignments of error on 23 July 2019, and the Government answered on 5 September 2019. On 10 October 2019, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant identified nine issues alleging he received ineffective assistance by Major MR and Captain (Capt) JK who represented Appellant at trial, and by Capt JK who represented Appellant in his post-trial clemency submission.

[4] U.S. CONST. amend. VI.

Amendment[5] because the military judge excluded attachments to his unsworn statement, and yet SB could discuss the collateral consequences of Appellant's conviction in her unsworn statement; (9) whether the military judge abused his discretion when he instructed the members to disregard the consequences to Appellant of sex offender registration; (10) whether Appellant's sentence to a mandatory dismissal is unconstitutional; (11) whether Appellant's sentence is inappropriately severe; (12) whether the military judge's undisclosed employment negotiations created a disqualifying appearance of bias; (13) whether Appellant was denied the right to procedural due process in the post-trial processing of his case; and (14) whether Appellant was denied effective assistance of counsel under the Sixth Amendment as alleged in nine deficiencies in the performance of his trial defense counsel.[6] In addition, we consider the issue of timely appellate review.

We find Appellant's conviction both legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. We thus affirm.

## I. BACKGROUND

Appellant first met 18-year-old SB, a female friend of a coworker's daughter, when she was introduced to Appellant at his workplace on Patrick Air Force Base (AFB), Florida. The visit and introduction occurred during the workweek before Father's Day weekend in 2016. On Sunday evening, while visiting the coworker's family as a guest in their home, Appellant digitally penetrated SB's vulva with his finger as SB lay down in a bedroom she shared with her best friend, FK. Appellant was convicted on the basis of SB's testimony, the testimony given by FK, FK's parents, and SB's mother, and by evidence uncovered in the investigation when SB reported the incident to civilian and military authorities.

Appellant was tried on 11–12 July 2017 and 8–11 January 2018 at Patrick AFB. On the eve of trial reconvening in January with Judge Spath presiding, Appellant, through two detailed military trial defense counsel, moved for a continuance so Appellant could be represented by a civilian defense counsel (CDC), Mr. Donald G. Rehkopf, Jr., Esquire, in addition to military counsel. Judge Spath denied the continuance. After trial, the CDC prepared a brief in accordance with Article 38(c), UCMJ, 10 U.S.C. § 838(c), which he intended for

---

[5] U.S. CONST. amend. V.

[6] We address the allegation that Appellant's military defense counsel were deficient during post-trial processing together with our resolution of his thirteenth assignment of error.

the convening authority's consideration before the convening authority took action on Appellant's case. However, the CDC submitted the brief to the convening authority's legal staff after action had been taken, and the convening authority did not recall the action to consider the brief.

In this appeal, Appellant claims structural error in Judge Spath's denial of Appellant's request for a continuance to be represented by the CDC, and alleges Judge Spath was disqualified from presiding at trial on grounds that his post-retirement employment negotiations created an appearance of bias. Appellant also claims prejudice from the convening authority's failure to recall the action to consider the CDC's Article 38(c), UCMJ, brief. We consider these allegations of error among the other aforementioned errors Appellant assigns for review, and begin with Appellant's contention that his conviction is legally and factually insufficient.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Facts

SB and FK became close friends in the two years they attended the same high school in Virginia and they kept in touch after FK's father, a major in the Air Force, was reassigned and moved with his family to Florida. FK's parents also developed a close relationship with SB, and FK's mother regarded SB as a daughter. SB graduated high school in Northern Virginia in the summer of 2016 when she was 18 years old. Her best friend, FK, was present at SB's graduation, and after the ceremony the two traveled together to Florida. SB stayed with FK and her family as a guest in their home near Patrick AFB.

SB arrived in Florida during the week before Father's Day weekend in June 2016. Shortly after, she joined FK on a visit to FK's father at the workplace he shared with Appellant. A week or two before SB's visit, FK's father told Appellant that SB was his daughter's best friend from high school, and Appellant would probably meet her. He portrayed SB as a pretty, athletic girl and showed Appellant her picture. Because FK's father knew Appellant was likely to make sexual comments during the visit, he told Appellant to tone down what Appellant said because SB was just 18 years old and might be uncomfortable with his jokes and sexual innuendo. On several occasions, FK and her family similarly prepared SB for Appellant's "very crude" humor, explaining Appellant "just happens to make very inappropriate jokes, specifically towards women," always excusing Appellant's behavior as "very harmless."

At the workplace, SB was introduced to Appellant who right away made a comment about the size of her breasts. In that same visit SB dubbed FK a "tomboy," to which Appellant retorted, "No, [FK] doesn't have a penis she has

a gigantic clit." SB left the office shortly after Appellant's comments. After the office visit, SB next saw Appellant when she and FK worked out at a gym. Although SB and Appellant had limited interaction, she overheard Appellant tell a friend in reference to SB, "Oh, look. [FK] brought me a little treat, another little treat." SB explained that FK had once introduced Appellant to a female friend from college who was adopted from China, and Appellant had remarked, "Oh, I want to eat my Chinese food. She's a treat of mine."

SB next saw Appellant on Father's Day. Appellant, his wife, and their two children joined FK's family and SB for brunch, and later in the afternoon were guests at a pool party and barbecue at FK's home. At one point, while SB played with Appellant's young daughter in the pool, Appellant swam up to SB, went underwater, and stared at a tattoo of a Bible verse on SB's right hip for about 30 seconds. SB found Appellant's behavior "very weird," and got out of the pool and changed into clothes.

At some point that day, FK's mother relayed to SB that Appellant gave good back rubs. Either in the kitchen with others present, or earlier in the day, Appellant gave backrubs to both SB and FK.[7] While in the kitchen, Appellant overheard a conversation about SB's inverted nipple, which prompted him to ask SB to show him her "boob" several times. SB testified she told Appellant "there is no way I am showing you my boob. That's not happening. I'm not doing that." Appellant approached FK on multiple occasions that afternoon to be, in Appellant's words, "his wingman" to help him convince SB to show him her breast. FK refused and at one point told Appellant to "please go away" because she "felt he was badgering [her] to make that happen."

Before dinner, and while FK, FK's mother, Appellant's wife, and others took a tour of nearby model homes, SB lay down alone on the bed in the room she was sharing with FK. FK's father stayed behind to finish preparing the meal, and asked Appellant to tell SB that dinner was ready. According to FK's father, Appellant left the kitchen, entered SB's room, and five to seven minutes passed until Appellant returned to the kitchen.

SB testified she was using her cell phone and her back was to the door when Appellant entered the bedroom and told her that dinner was ready. She replied she would be out shortly. Appellant approached her from behind as she lay on the bed and tickled up her leg. She felt Appellant's body "coming on over" hers, and was "frozen," thinking, this was another "joke." She asked Appellant, "What are you doing? What is this, a joke? What is going on right now?" and

---

[7] SB testified on cross-examination that the backrub may have been earlier in the day and she was unsure of the timeline.

told Appellant, "This is not funny." Appellant replied, "No. This is not a joke. I'm not joking." SB described that Appellant was "hovering" over her body while telling her she was "gorgeous" and "need[ed] to make time for him," and that Appellant could "make this happen" if she babysat while Appellant's wife worked the night shift at her job.

SB noticed Appellant had an erection. She testified "things kept escalating" as she tried to get off the bed, when Appellant moved her underwear and "shoved his finger into [her] vagina." SB felt Appellant's knuckles as he digitally penetrated her. Her genitals were uncomfortable because she was recovering from a vaginal infection. SB told Appellant to "[g]et off of [her]," pushing him away on his upper body and he pulled his fingers out of her. SB ran to the bathroom, locked the door, and waited until she heard Appellant leave. She then returned to the bedroom to get her phone and promptly tried calling, and then texted, FK's phone. SB texted FK to "[c]ome home right f[**]king now," and "[l]iterally right now I'm hyperventilating." SB relayed that "[Appellant] just put his fingers in [her] vagina and kissed [her]," and pleaded for FK to "come home" because she was "freaking out," "can't breath[e,]" and was "bawling." SB texted FK again, asking FK to "[c]ome home," "please come home," to "[p]lease answer [her]," and relayed, "I'm hiding in your closet with the door locked." After getting no response from FK, SB tried calling FK's mother, but FK's father picked up his wife's phone and answered instead.

FK's father testified about what happened when Appellant returned to the kitchen and before he picked up his wife's cell phone. He asked Appellant, "Is everything all right?" and Appellant replied, "Yeah, everything is fine." A couple of minutes later, FK's father noticed his wife had left her cell phone behind when it started to ring. He looked at the phone and saw SB was identified as the caller, and thought it was odd she was calling from inside the house. He answered the phone and SB asked him if he would "come down here please?" and not to be, in his words, "too conspicuous about it." FK's father entered his daughter's bedroom where SB was staying and saw that SB was teary-eyed and upset. He asked her what was wrong and SB replied, "He touched me . . . . Yeah, he touched me. He put his fingers in my vagina."

FK's father returned to the kitchen and asked Appellant, "Did you touch her inappropriately?" Appellant replied, "Yes," and tried to elaborate, but FK's father told Appellant he needed to "get [his] s[**]t and leave now." The group that had left the house were returning as Appellant was leaving. Appellant approached FK's mother and said, "I think I owe you an apology. . . . There was a misunderstanding between [SB] and me." FK and her mother then went to FK's bedroom and found the door was locked. SB opened the door and was crying. SB relayed to them that Appellant had touched her and put his fingers

inside her vagina. SB reported the incident to her parents, and a civilian and military investigation ensued.

At some point during the gathering of families on Father's Day at FK's home, SB told FK she thought Appellant had a crush on her. FK found the idea silly, because she would "never know a Major in the Air Force to have a crush on an 18 year old girl."

**2. Law**

Appellant was convicted of sexual assault by bodily harm in violation of Article 120(b)(1)(B), UCMJ, 10 U.S.C. § 920(b)(1)(B), which required the Government to prove four elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon SB by penetrating her vulva with his finger; (2) that Appellant did so by causing bodily harm to SB, to wit: penetrating her vulva with his finger; (3) that Appellant did so with an intent to gratify his sexual desire; and (4) that Appellant did so without the consent of SB.[8] *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(4)(b). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act." Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3). With regard to consent, the statute provides, "'[C]onsent' means a freely given agreement to the conduct at issue by a competent person." Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." Article 120(g)(8)(C), UCMJ, 10 U.S.C. § 920(g)(8)(C).

A court of criminal appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

---

[8] In a separate assignment of error, Appellant claims the specification fails to state an offense because the element of consent lacked a *mens rea* requirement. We disagree. "Congress clearly intended a general intent mens rea for Article 120(b)(1)(B)," *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

*States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 3. Analysis[9]

Appellant argues the evidence is insufficient because SB was not a credible witness in that she did not attempt to push Appellant off of her sooner, and because of the inherent improbability that Appellant could have committed the act without her participation and, thus, consent. We conclude a reasonable factfinder would find SB's testimony and the supporting evidence both probable and convincing. SB's testimony provided convincing proof of each of the elements of the offense, to include that Appellant penetrated her vulva with his finger and did so without SB's consent and with intent to gratify his own sexual desire. Other evidence lends support to her testimony and proof of the charged offense, including SB's actions moments after the assault that included her texting FK that Appellant had "put his fingers in [her] vagina," SB's demeanor as observed by FK and FK's parents, and Appellant's admission to FK's father that he touched SB inappropriately and to FK's mother that Appellant owed her an apology.

---

[9] In his brief, Appellant's counsel cites information that was not introduced in the findings portion of trial for this court's determination of the factual and legal sufficiency of his conviction, and thus, this court cannot consider it. *See United States v. Reed*, 54 M.J. 37, 43–44 (C.A.A.F. 2000) (citations omitted) (The "record" refers to matters introduced at trial. Matters outside the record may not be considered for factual or legal sufficiency on appeal).

Appellant also contends the Government failed to disprove that Appellant labored under an honest and reasonable mistake of fact as to consent. Mistake of fact as to consent is a defense to sexual assault. *See* R.C.M. 916(j)(1). It requires that an appellant, due to ignorance or mistake, incorrectly believed that another consented to the sexual conduct. *See id.* To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)) (charge of rape). Having just met before the weekend, Appellant and SB had little interaction before the offense and none of it was mutually sexual or involved activities unaccompanied by others. The settings were an office, a gym, and gatherings of families including children at a restaurant for breakfast and later at a co-worker's home on Father's Day. To be persuaded by Appellant's argument that he was mistaken, a factfinder would have to discount evidence that Appellant initiated sexual penetration of SB's vulva with his finger when he approached SB unannounced while she was alone in a bedroom with her back to the door. FK's father told Appellant to tone down Appellant's sexual comments and innuendo during SB's visit. SB rebuffed his request that she show Appellant her breasts, and FK told Appellant she would not be his "wingman" to convince SB otherwise. None of Appellant's interactions with SB before the offense should have led him or a reasonable person to believe that SB would consent to Appellant penetrating her vagina with his finger. On these facts we find the Government proved beyond a reasonable doubt that Appellant was not reasonably mistaken as to consent.

Considering the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of sexual assault as charged. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

**B. Defense Motion for Continuance to Retain Civilian Counsel**

**1. Additional Background**

The Charge and its two specifications were preferred on 31 January 2017 and an Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing took place on 3 February 2017. Appellant was informed of his right to counsel including the right to be represented by civilian counsel of his own choosing at his own expense, R.C.M. 405(d)(3)(C), and elected to be represented by military counsel.

Appellant was arraigned on the docketed trial date of 11 July 2017. During this Article 39(a), UCMJ, session, the first military judge informed Appellant

of his right to retain civilian counsel under R.C.M. 506(a). After a defense continuance request to have access to a deployed witness, the trial was scheduled to reconvene on Monday, 8 January 2018, to allow time for the Government to obtain the unavailable witness[10] and produce discovery compelled by the first military judge. Meanwhile, Appellant released both of his detailed military counsel because they were set to begin new positions well before the new trial date,[11] and two different military trial defense counsel were detailed to represent Appellant.

Towards the end of the nearly seven month period that trial was delayed, Appellant avers he experienced growing unease about his military defense counsel and his case. In late December 2017 he reached out to a lawyer friend who advised Appellant to contact the CDC who would subsequently represent Appellant in post-trial matters and this appeal. Appellant contacted the CDC on Wednesday afternoon, 3 January 2018, and notified his military counsel on Friday, 5 January 2018, of his intent to retain the CDC. That same day the CDC signed a "Notice of Provisional Appearance" stating he was unavailable to begin a contested trial on Monday.

The CDC stated in the notice he was "conditionally retained" to represent Appellant "subject to the approval of the Presiding Military Judge." The CDC explained he "advised [Appellant] that [the CDC] was unavailable to begin a contested GCM on Monday, 8 January 2018, and that the Military Judge would have to approve a continuance." The provisional notice mentioned that the CDC discussed with Appellant "other motions and investigations that in [the CDC's] professional opinion would have to be done," but did not indicate when the CDC was available to appear in court. The notice mentioned the steps Appellant was taking to pay one-third of the CDC's retainer fee by Monday, with the rest paid not later than Friday, 12 January 2018.

On Saturday, 6 January 2018, Appellant's military defense counsel filed a motion to continue the case to give the CDC time to prepare for trial. Both the Government and SB, through her detailed victim's legal counsel (VLC), opposed the motion. Accompanying the motion was Appellant's own affidavit explaining he hired the CDC because of discomfort with the preparedness and experience of his military defense counsel.

On Monday, 8 January 2018, Judge Spath reconvened the court-martial as scheduled and held a hearing on the motion. He asked Appellant by whom he

---

[10] In the end, the witness did not testify.

[11] On 14 July 2017, Appellant released his first pair of military defense counsel. When he did so, Appellant signed two written releases that advised him of his right to hire and be represented by civilian defense counsel.

wished to be represented at trial, and Appellant identified both his detailed military defense counsel who were present and the CDC who was not. The CDC testified by telephone that he first spoke to Appellant five days before trial. The CDC explained he had formed an attorney-client relationship with Appellant and that the "provisional" notice of representation was patterned on a practice utilized in New York state courts. The CDC stated he would be available for trial during the week of 26 March 2018. On cross-examination, the CDC stated he did not have any upcoming trials but was working on "four habeas writs"[12] involving military trials and appeals that he needed to file before 20 March 2018. Both military counsel acknowledged they were prepared to represent Appellant.

After the military judge denied the motion for continuance and the CDC received Appellant's fee, the CDC did not file a notice of appearance with the trial court or otherwise indicate a change in the provisional nature of the notice he gave or that he was unconditionally retained to represent Appellant at trial.[13]

### 2. Law

An accused has a Sixth Amendment right to counsel of choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citations omitted). If an appellant has been erroneously deprived of this right, then the "violation is not subject to harmless-error analysis." *Id.* at 152. A trial court nonetheless has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." The United States Supreme Court has observed:

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

---

[12] Writs of habeas corpus. *See* All Writs Act, 28 U.S.C. § 1651(a).

[13] In a post-trial declaration to this court, the CDC avers "[a]s the court-martial progressed, [the CDC] was in continuous contact either via telephone or email with [Appellant] and his detailed counsel, and assisting them 'remotely' on some of the legal issues that were arising during the trial."

*Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)); *United States v. Wellington*, 58 M.J. 420, 425 (C.A.A.F. 2003).

We review a military judge's denial of a request for a continuance to be represented by civilian counsel of choice for an abuse of discretion. *United States v. Wiest*, 59 M.J. 276, 279 (C.A.A.F. 2004) (citing *United States v. Weisbeck*, 50 M.J. 461, 464–66 (C.A.A.F. 1999)). In determining whether the military judge abused his discretion, we consider the factors articulated in *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997) (citation omitted). *See Wiest*, 59 M.J. at 279 (citations omitted) (listing *Miller* factors). The factors include:

> surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.

*Miller*, 47 M.J. at 358 (quoting F. Gilligan and F. Lederer, *Court-Martial Procedure*, § 18–32.00, at 704 (1991)).

An abuse of discretion "requires more than just [a reviewing court's] disagreement with the military judge's decision." *United States v. Bess*, 75 M.J. 70, 73 (C.A.A.F. 2016) (citing *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015)). An abuse of discretion occurs when the military judge's findings of fact are clearly erroneous, when an erroneous view of the law influenced his decision, or when his decision is "outside the range of choices reasonably arising from the applicable facts and the law." *Id.* (quoting *Stellato*, 74 M.J. at 480). The challenged decision "must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

### 3. Military Judge's Ruling Denying the Continuance

Trial was scheduled to commence on Monday, 8 January 2018, as agreed upon by all parties in late July 2017. In an oral ruling at the Article 39(a), UCMJ, session, on 8 January 2018, the military judge denied the Defense's motion for a continuance. The military judge supplemented his ruling on the record, adding greater detail on Thursday, 11 January 2018, the last day of trial. He found the parties agreed on 31 July 2017 to reconvene for trial the week of 8 January 2018. Between 31 July 2017 and 5 January 2018, Appellant's military counsel participated in joint status updates and none mentioned the potential for civilian counsel to represent Appellant. On Friday, 5 January 2018, the Defense notified the Government and military judge that the Defense

would request a continuance. The military judge received this notice at 1622 hours on the last weekday before the 8 January 2018 trial date.

On Saturday, 5 January 2018, the CDC entered a notice of a provisional appearance contingent on receipt of fees and a delay in the proceedings. The CDC did not have any court appearances scheduled for the week of Appellant's trial. He did not make any efforts to travel to Patrick AFB in advance of trial,[14] and he did not formally enter an appearance while awaiting payment of his retainer. The CDC had no trial obligations between the date of trial and 28 March 2018,[15] the date of the requested continuance, but he needed to file four habeas petitions.

The military judge found the CDC did not enter a formal appearance after he received the retainer fee from Appellant on 8 January 2018. He found the March 2018 continuance date "a bit optimistic" bearing in mind that the CDC indicated further investigations and motion practice would have to be done. The military judge observed that the charge sheet had been served on Appellant in March[16] "and motion practice had already been completed in July of 2017." The military judge noted that the CDC picked the March 2018 date "with no discussion of availability of other counsel or other witnesses."

After considering Appellant's burden as the moving party, R.C.M. 906, and relevant case law, the military judge denied Appellant's continuance request. The military judge considered whether fairness dictated he should grant the request, with fairness assessed against Appellant's Sixth Amendment right to counsel. Citing *Morris*, the military judge observed the right is not absolute and must be balanced against society's interest in the efficient and expeditious administration of justice. In performing this assessment, the military judge found that he should consider a named victim's right under Article 6b(a)(7), UCMJ, 10 U.S.C. § 806b(a)(7), to have a proceeding free from unreasonable delay, so long as the assertion of that right did not deprive an accused of his Sixth Amendment right. The military judge stated that even if a reviewing court found that SB lacked standing on a continuance motion, his analysis would remain the same.

---

[14] The CDC averred that a snowstorm at the CDC's location when trial began prohibited travel to Patrick AFB.

[15] This finding was error. The date the CDC said he was available was 26 March 2018.

[16] The referred charge and specifications were served on 6 March 2017. The military judge misstated the service date as "March of '16."

Before analyzing the *Miller* factors, the military judge found that Appellant was informed of his right to retain civilian counsel multiple times and had sufficient opportunity to retain civilian counsel of his choice. Considering the significant delay already in the case, and the fact that Appellant had sufficient opportunity to obtain civilian counsel, the military judge found that proceeding to trial was "neither unreasonable [n]or arbitrary."

The military judge then applied the *Miller* factors he considered germane to consideration of a continuance[17] and denied Appellant's request. As to each factor, he found as follows:

### a. Surprise

The timing of Appellant's continuance request was a surprise to the trial court and to the Government because it came at the end of the last business day before trial was set to commence. The military judge found this factor weighed against Appellant, citing the multiple times Appellant "was informed of, indicated he understood, and exercised his rights to counsel."

### b. Timeliness of the request

The military judge found Appellant "had more than a reasonable ability and opportunity to secure counsel of his choice" after July 2017 and that "[h]e failed to do so in a timely manner despite being advised of his rights on multiple occasions and exercising them on at least one occasion." Appellant's request was untimely, he found, because Appellant did not request the continuance until the end of the last business day before trial, after the parties agreed on 31 July 2017 to reconvene for trial the week of 8 January 2018. The military judge found this factor weighed against Appellant.

### c. Availability of witness or evidence requested

While noting that Appellant's continuance request was not based on a request for evidence or a witness, the military judge noted that the parties agreed to the January 2018 date, and that further delay would require the Government to rearrange witness travel. The military judge took note that scheduling of the 8 January 2018 trial included consideration of the availability of a witness whose presence Appellant had requested. This factor weighed against Appellant.

### d. Length of continuance

---

[17] The military judge found two factors inapplicable, and they were not part of his analysis: the nature of any evidence involved and the availability of substitute testimony or evidence. *See Miller*, 47 M.J. at 358 (quoting F. Gilligan, *Court-Martial Procedure*, § 18–32.00, at 704).

The military judge considered that Appellant's CDC requested a delay until the last week of March 2018, but this date did not account for the availability of other witnesses, experts, and the Government counsel. Based on the CDC's indication that further investigation and motion practice would have to be done, the military judge considered the March date "optimistic." He found a nearly three-month delay after a six-month delay weighed against Appellant especially considering that the CDC did not have any trials during this period that justified the delay.

### e. Prejudice to opponent

The military judge found the Government had "some limited right in the orderly administration of justice." He found a concern that delay in timely presentation of testimony on the merits could affect witness testimony and the memory on which it depends. In assessing this factor, he considered SB's Article 6b, UCMJ, right to a proceeding free from unreasonable delay that SB's VLC asserted on her behalf, but observed "[t]his factor didn't carry very much weight in [his] analysis." The military judge found what little weight it did have favored the Government.

### f. Moving party received prior continuance

The military judge found Appellant had already been granted a six-month continuance to secure the attendance of a possible witness and to align a new trial date with the schedules of counsel for both sides and all witnesses. The military judge noted the original docketed 11 July 2017 trial date was established in April 2017. The military judge found this factor weighed against Appellant

### g. Good faith of moving party

The military judge contrasted the good faith of Appellant's military counsel—who notified the military judge as soon as they were aware Appellant planned to hire the CDC—with Appellant's actions, which he found "problematic." Specifically, the military judge referred to Appellant's decision to wait until the last business day before trial to be represented by the CDC, which generated the request. The military judge found this factor was "reasonably neutral" and stated "I have no doubt the party acted in good faith." The military judge contrasted again the good faith of Appellant with that of the CDC who took on representation for a trial he knew he could not attend that was starting the next business day. The military judge took into account that the CDC had not entered an appearance even after he had been retained and the CDC's retainer payment was no longer pending.

### h. Use of reasonable diligence by moving party

The military judge found Appellant did not show diligence in making the request because "[i]t was provided to this court [at] 1622 hours on 5 January 2018, the very end of the last business day before trial was scheduled to commence. At best, initial contact was made with civilian counsel by the accused on 3 January 2018."

### i. Possible impact on verdict

The military judge found two qualified military defense counsel represented Appellant, including an experienced senior defense counsel. He noted both counsel proffered they were prepared for trial and that they would, and did, provide effective representation. The military judge caveated his analysis of this factor noting that his assessment that Appellant "did receive effective representation" was "not relevant to this ruling" because he denied the continuance before he could observe the effectiveness of counsel. The military judge found that "[a]dding a counsel is going to have no appreciable effect on the verdict simply because he happens to be a civilian counsel," and appeared to weigh this factor against Appellant without stating as such.

### j. Prior notice

The military judge found there was no issue of prior notice of the January 2018 proceeding, and this factor weighed against Appellant. The date trial was scheduled to reconvene was established on 31 July 2017. Appellant had been on notice of the 8 January 2018 trial date for over five months.

### 4. Analysis

The military judge did not abuse his discretion when he denied the Defense's motion. The military judge detailed his consideration of the *Miller* factors in his ruling, and the weight of the factors fell in favor of the Government. *Miller* examines a number of factors useful in determining whether a judge has abused his discretion. We, too, consider the application of those factors bearing in mind that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." *Ungar*, 376 U.S. at 589. Although the right of the victim to a proceeding free from unreasonable delay is not among the listed factors, the military judge appropriately considered it when determining if there was prejudice to Government and did not give the matter undue weight.

A fair reading of the record suggests that there was no "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris*, 461 U.S. at 11–12 (quoting *Ungar*, 376 U.S. at 589). If there was one controlling factor in the ruling, it is whether Appellant had reasonable opportunity to secure counsel of choice, *see Miller*, 47 M.J. at 358, and the military judge found Appellant had been given that opportunity. That Appellant

failed to secure counsel of choice in a timely manner was relevant to the military judge's "wide latitude" to balance the right to counsel against the court's calendar, *see Gonzalez-Lopez*, 548 U.S. at 151 (citation omitted). Indeed, the focus of the ruling was that Appellant had been informed of his right to be represented by civilian counsel and did not begin searching for civilian representation until late December 2017, after a lengthy continuance had been granted, and then secured provisional representation on the eve of trial reconvening.

The military judge gave appropriate consideration to the provisional nature of the CDC's notice of appearance, which stated that the CDC was "conditionally retained" to represent Appellant "subject to the approval of the Presiding Military Judge." Both the timing and substance of the notice were properly relied on by the military judge. The record shows Appellant's request for a nearly three-month delay was not based on a need to deconflict the CDC's trial schedule—he had none, and offered little assurance that a third continuance would not be necessary.

The military judge made findings of fact supported by the evidence, applied those facts to the appropriate law, and used the *Miller* factors to conclude Appellant's continuance request was unreasonable. The military judge's application of the *Miller* factors and his decision to deny the request was not "clearly untenable," *Miller*, 47 M.J. at 358 (quoting *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)), or "outside the range of choices reasonably arising from the applicable facts and the law," *Bess*, 75 M.J. at 73 (quoting *Stellato*, 74 M.J. at 480). We conclude his decision was neither arbitrary, fanciful, clearly unreasonable, nor clearly erroneous. *See Solomon*, 72 M.J. at 179 (quoting *White*, 69 M.J. at 239).

**C. Alleged Denial of Right to a Public Trial**

On two occasions, the first military judge held an Article 39(a), UCMJ, session and closed the courtroom to spectators to determine whether evidence that might qualify as sexual behavior or predisposition was admissible in Appellant's trial. *See* Mil. R. Evid. 412(c)(2) ("Before admitting evidence under this rule, the military judge must conduct a hearing, which shall be closed."). The record shows spectators departed the courtroom on both occasions before the military judge took evidence to decide admissibility.

Appellant did not object to the closures nor did any member of the public. Before the first closure and while SB was on the witness stand, the military judge asked the Defense, "So, my understanding is we want to take up some additional matters in closed session than [sic] at this time?" The trial defense counsel who at the time was conducting a direct examination of SB replied, "Yes, sir," and continued his examination of SB in the closed session. After

going back into open session of the court and before the second closure, the military judge notified the parties of a matter he would consider in a closed session and then asked the Defense if there was "anything further?" before closing the court. The trial defense counsel replied, "No, sir, not in this open session." In the closed session that followed, the military judge, counsel for both parties, and SB's VLC discussed a matter that SB's VLC claimed was protected by his attorney-client privilege with SB, as well as a matter involving SB's medical and cell phone records as they related to the Government's discovery obligation and Mil. R. Evid. 412 admissibility.

Appellant contends for the first time on appeal that he was denied his Sixth Amendment right to a public trial and the military judge erred in failing to conduct the four-part closure analysis under R.C.M. 806(b)(5). *See also Waller v. Georgia*, 467 U.S. 39 (1984) (holding state court failed to give proper weight to a criminal defendant's Sixth Amendment right to a public trial at a weeklong suppression hearing that was closed over defense objection).

Appellant observes that the military judge and *all* counsel apparently just assumed that the closure and sealing provisions of Mil. R. Evid. 412(c)(2) controlled the matter. We find Appellant waived this issue by failing to object so that the military judge might conduct the closure analysis, which we decline to conduct after the fact. It is the military judge, not a court of criminal appeals, that "makes case-specific findings on the record justifying closure." *See* R.C.M. 806(b)(5). We decline Appellant's suggestion that we should find structural error and remand for a new trial because this was not done.

Appellant's failure to object at trial waived the right to challenge the closed hearing requirement of Mil. R. Evid. 412(c)(2), and thus leaves no error for this court to correct on appeal. *See Levine v. United States*, 362 U.S. 610, 619–20 (1960) (counsel and client forfeited public trial challenge by failing to ask trial judge to open the proceedings); *see also Peretz v. United States*, 501 U.S. 923, 936 (1991) ("failure to object to closing of courtroom is waiver of right to public trial" (citing *Levine*, 362 U.S. at 619)). In reaching this result we recognize that in *United States v. Hershey*, a case decided 25 years after the Supreme Court decided *Levine*, our superior court applied a more stringent test than the Supreme Court did in *Levine*, requiring an appellant's waiver of a public trial to be "intentional and knowing." 20 M.J. 433, 437 (C.M.A. 1985) (quoting *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979)) (additional citation omitted) (refusing to apply the doctrine of waiver). *Hershey* relied on a decision by the United States Court of Appeals for the First Circuit, *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979), as authority for this conclusion, and cited Supreme Court precedent that predated *Levine* for support.[18] *Hershey*, 20 M.J.

---

[18] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

at 437. The Supreme Court's later decision in *Peretz* and those of several federal circuits including the First Circuit cast doubt on the validity of *Hershey* as precedent.[19]

Even if *Hershey* remains the law of this jurisdiction after the Supreme Court in *Peretz* followed the Court's precedent in *Levine*, we still find waiver. The trial defense counsel did not just fail to object, but acceded both times to the closed session. Before the first closure, Appellant's counsel agreed with the military judge's understanding that the Defense wanted to continue its direct examination of a witness in a closed session. Before the second closure, counsel agreed there was nothing further to discuss in the open session. Both the statements and actions of counsel evince an "intentional and knowing" waiver on Appellant's behalf. *See Hershey*, 20 M.J. at 437. Thus, Appellant's public trial challenge to Mil. R. Evid. 412 was waived, *see id.*, and we determine to leave the waiver intact, *see United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted) (courts of criminal appeals "are required to assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error.").

## D. Challenge to the Reasonable Doubt Instruction

Also for the first time on appeal, and what appears to be an issue of first impression, Appellant challenges the reasonable doubt instruction the military judge gave as constitutionally unsound. Appellant claims it was error to instruct that a reasonable doubt is one "arising from the state of the evidence," as the military judge stated in both his preliminary instructions to the members and again after the close of evidence. Appellant claims he was denied a fair trial because the military judge erred in failing to instruct that reasonable doubt may arise from a lack of evidence as opposed to the state of the evidence. Appellant argues we should find structural error and remand for a new trial.

---

[19] *See, e.g.*, *United States v. Reagan*, 725 F.3d 471, 488–89 (5th Cir. 2013) (knowledge of courtroom closure and failure to object unreviewable), *cert. denied*, 572 U.S. 1003 (2014); *United States v. Christi*, 682 F.3d 138, 142–43 (1st Cir. 2012) ("In <u>*Peretz*</u>, the Supreme Court expressly cited [*Levine v. United States*, 362 U.S. 610, 619 (1960)] for the proposition that a failure to object to closing a courtroom waives any claim of infringement to a right of public trial."), *cert. denied*, 568 U.S. 988 (2012); *Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009) (If the litigant does not assert the right to a public trial "in a timely fashion, he is foreclosed." (quoting *Freytag v. Commissioner*, 501 U.S. 868, 896 (1991)), *overruled in part on other grounds by Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017).

Before trial, Appellant advocated for a modified reasonable doubt instruction and raised an objection to the standard instruction that is unlike the challenge he makes now.[20] After the close of the Government's case, the military judge requested proposed instructions from counsel for both parties. Appellant requested a mistake of fact instruction, but did not seek a modified reasonable doubt instruction as he did before trial. After the military judge circulated his draft instructions, Appellant asked for an instruction regarding his decision not to testify and again proposed no modification to the reasonable doubt instruction. The military judge asked whether the Defense had any objections or requests for additional instructions. Trial defense counsel replied, "No. Your Honor." After the arguments of counsel the military judge again asked the Defense if there were any objections to the findings instructions or request for additional instructions. Counsel again answered in the negative.

Whether an appellant has waived an objection to a findings instruction is a legal question that this court reviews de novo. *United States v. Davis*, ___ M.J. ___ , No. 19-0104, 2020 CAAF LEXIS 76, at *6–7 (C.A.A.F. 12 Feb. 2020) ("By 'expressly and unequivocally acquiescing' to the military judge's instructions, Appellant waived all objections to the instructions." (quoting *United States v. Smith*, 9 C.M.R. 70, 72 (C.M.A. 1953))). The CAAF in *Davis* repeated what the court has previously explained is the significance of waiver, as opposed to forfeiture:

> "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Consequently, while we review forfeited issues for plain error, "we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009).

*Id.* at *6 (internal quotation marks omitted).

Before trial, Appellant suggested a modification to the reasonable doubt instruction without identifying changes to the language he now claims is constitutionally deficient. Then, at trial he twice declined to propose an instruction like the one he proposes now, and twice declined to object to the instruction and offered no additional instructions when prompted by the military judge.

---

[20] Appellant moved for appropriate relief to instruct that the members "should," and not "must," convict if they are convinced of Appellant's guilt beyond a reasonable doubt. The first military judge denied the motion in an Article 39(a), UCMJ, session without members. The military judge who presided on the merits instructed that the members "may find" Appellant guilty of an offense if they are firmly convinced of guilt.

On these facts, Appellant expressly and unequivocally acquiesced to the reasonable doubt instruction the military judge gave to the members. *See Davis* at \*7 (citing *United States v. Wall*, 349 F.3d 18, 24 (1st Cir. 2003) ("[C]ounsel twice confirmed upon inquiry from the judge that he had 'no objection and no additional requests [regarding the instructions].' Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal." (alteration in original))). Appellant thus waived the objection he raises on appeal, *see id.*, and we determine to leave his waiver intact, *see Chin*, 75 M.J. at 223 (citation omitted).

**E. Sentencing**

Appellant assigns five errors he claims occurred in sentencing. First, Appellant claims he was denied his Sixth Amendment right to confront SB after she read an unsworn victim impact statement in presentencing. Second, he alleges the military judge abused his discretion by sustaining an objection to documents Appellant wanted to attach to his written unsworn statement. Third, he claims he was deprived of due process and equal protection under the law in violation of his rights under the Fifth Amendment because he was prohibited from including the attachments in his unsworn statement, and yet SB could discuss the collateral consequences of Appellant's crime in her unsworn statement. Fourth, he claims that it was error for the military judge to allow Appellant to mention the consequence to him of having to register as a sex offender, and then instruct the members to disregard those consequences.[21] Lastly, Appellant claims his sentence that includes a mandatory dismissal was unconstitutional and inappropriately severe.

**1. Additional Background**

After the Government rested its sentencing case, SB read an unsworn statement. She described how "a lot of things changed" in her life after the sexual assault including her relationship with her best friend and her best friend's family. It also affected her "entire freshman year of college," which was "full of sadness, loss, doubt, and a lack of self-esteem." In the summer after her first year "she couldn't hold [her] part-time job because of [her] distress for strangers and fear of being alone." SB thanked the members for their "gift of closure" and conveyed optimism that with the trial over she could restore her friendship with her best friend, and could "start to live life as a normal college

---

[21] Appellant's appellate counsel does not assert instructional error on its own, but includes it as a footnote to the assignment of error that alleges the military judge erred when he excluded the two attachments. We consider the issue even though counsel did not raise a distinct claim that the military judge abused his discretion. *See* JT. CT. CRIM. APP. R. 18(a) (effective 1 Aug. 2019) ("Appellate Counsel for the accused may file assignments of error, setting forth separately each error assigned.").

student" without interruptions to talk to investigators and attorneys. The military judge prefaced SB's statement with an instruction to the members about how they could use the information SB presented:

> The weight and significance to be attached to an unsworn statement rests with the sound discretion of each court member. You may consider that the statement is not under oath, it's [sic] inherent probability or improbability, whether it is supported or contradicted by evidence in the case, as well as any other matter which may have a bearing upon its credibility. In weighing and [sic] unsworn statement you are expected to use your common sense, and your knowledge of human nature, and the ways of the world.

In the presentencing proceeding, Appellant elected to give a verbal unsworn statement in response to questions that were put to him by his counsel. The military judge first gave an instruction about the unsworn statement that was similar to the one he gave before SB's statement. Appellant said he thought about the day of the incident "[e]very day," and how "one lapse of judgment" "can screw everything up." He acknowledged understanding he would be a "registered sex offender just based on this conviction"[22] and that his status would impact his ability to go to meetings at his children's school, and also to be present at his children's gymnastics and cheerleading practices. Appellant explained to the members this was because, based on his understanding, "a registered sex offender isn't allowed anywhere near schools or anything like that regardless of it being a minor or an adult offense," and these limitations would last a "lifetime." Appellant told the members that the mandatory dismissal "as well as being a registered sex offender" would make it hard for him to find a job. He emphasized, that no matter how much time he would spend confined, "a dismissal and having to register is going to affect everything."

At the end of Appellant's verbal presentation, the trial defense counsel offered Appellant's written unsworn statement that was substantially the same as Appellant's verbal statement and marked it as a Defense Exhibit. The written presentation as offered included two attachments: a 5-page appendix to a

---

[22] The trial defense counsel asked, "Now you know you'll have to be a registered sex offender just based on this conviction, correct?" Appellant answered, "Yes, ma'am."

Department of Defense Instruction (DoDI) listing offenses that require sex-offender processing;[23] and a 22-page article about the collateral consequences of sex-offender registry laws.[24] The trial counsel objected to the inclusion of these attachments on grounds that they were not Appellant's statements. Trial defense counsel defended their inclusion, in part, arguing it was the Defense's "understanding that [the members] are going to be given an instruction, essentially, to disregard this as part of the[ir] deliberation[s]" and that the instruction would place the attachments "in the proper context." The military judge sustained the objection for two reasons: (1) neither document was Appellant's own statement; and (2) admitting them as an exhibit and then charging the members to disregard collateral consequences of sex offender registration requirements in arriving at a sentence was inapposite. The military judge allowed the Defense to publish Appellant's written unsworn statement without the attachments that was marked as a Defense Exhibit. He instructed the members it was part of Appellant's unsworn statement and reminded them of the instructions he had given earlier regarding unsworn statements.

Trial defense counsel did not object to the military judge's sentencing instructions, which included this description of sex-offender registration requirements and that collateral consequences of Appellant's conviction should not be part of the members' deliberations in reaching a sentence:[25]

> Under DOD instructions when convicted of certain offenses, including the offense here, the accused must register as a sex offender for the appropriate authorities and the jurisdiction of which he resides, works, or goes to school. Such registration is required in all 50 states. The requirements may differ between jurisdictions. Thus, specific requirements are not necessarily predictable. It is not your duty to attempt to predict sex offender registration requirements or the consequences thereof.
>
> While the accused is permitted to address these matters . . . in an unsworn statement, these possible collateral consequences should not be part of your deliberations in arriving at a sentence. Your duty is to adjudge an appropriate sentence for this accused

---

[23] Department of Defense Instruction 1325.07, *Administration of Military Correctional Facilities and Clemency and Parole Authority*, Encl. 2, App. 4 (11 Mar. 2013) ("Listing of Offenses Requiring Sex Offender Processing").

[24] Erika D. Frenzel, *Understanding Collateral Consequences of Registry Laws: An Examination of the Perceptions of Sex Offender Registrants*, 11 JUST. POL'Y J. 2 (Fall 2014).

[25] The instruction was modeled on the sentencing instructions in the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 75 (10 Sep. 2014).

based upon the offense for which he has been found guilty that you regard as fair and just when it is imposed and not one whose fairness depends on possible requirements of sex offender registration and the consequences thereof in certain locations in the future.

Before issuing the above instruction to the members, the military judge gave both parties the opportunity to discuss his proposed sentencing instructions, including the one he gave in response to Appellant's unsworn statement regarding sex offender registration. Afterwards, in an Article 39(a), UCMJ, session, the military judge asked whether the Defense had any objections or requests for additional instructions. Other than a request to highlight a matter in mitigation involving Appellant's family, the Defense responded, "And that's it, Your Honor." After a brief recess during which the military judge finalized his instructions, the military judge asked again if the Defense had any objections or request for additional instructions. The trial defense counsel replied, "No, Your Honor." After argument by both sides, the military judge again asked if the Defense had any objections or request for additional instructions. The Defense replied it had no objections to the instructions that were given.

### 2. Victim's Unsworn Statement and Confrontation

Appellant claims R.C.M. 1001A(e), which authorizes a crime victim to give an unsworn statement in presentencing, is unconstitutional on its face and as applied on grounds that it deprives Appellant and those similarly situated of their Sixth Amendment right of confrontation at a critical stage of a criminal trial. Although Appellant did not object at trial, under any standard of review we disagree.

"[T]he Sixth Amendment right of confrontation does not apply to the presentencing portion of a non-capital court-martial." *United States v. McDonald*, 55 M.J. 173, 177 (C.A.A.F. 2001). In *McDonald*, a three-judge majority noted that "Congress would not be disabled from changing the sentencing procedures in the military." *Id.* at 177. Judge Sullivan, concurring in the result, agreed with the majority that "the Sixth Amendment does not require an adversarial sentencing proceeding with a right of confrontation." *Id.* at 179 (Sullivan, J., concurring) (citation omitted).

In 2013, Congress revised presentencing procedures by enacting Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 6b(a)(4)(B),[26] to give a crime victim the right to

---

[26] National Defense Authorization Act (NDAA) for Fiscal Year 2014 (FY14), Pub. L. No. 113–66, § 1701, 127 Stat. 672, 952 (2013).

be reasonably heard. In a 2015 amendment to the *Manual for Courts-Martial, United States*,[27] R.C.M. 1001A was added to implement Article 6b(a)(4)(B), UCMJ, and to allow a victim to make an unsworn statement that is not subject to cross-examination, though either party may "rebut any statements of facts therein." R.C.M. 1001A(e). Accordingly, the right to confrontation did not extend to the presentencing proceeding of Appellant's court-martial, and we find no error.

### 3. Exclusion of Attachments to Appellant's Unsworn Statement

Appellant maintains the military judge erred in ruling to exclude the attachments to Appellant's written unsworn statement that referenced sex offender registration and its consequences.[28] Appellant claims the attachments would have explained the consequences of the Federal Sexual Offender Registration and Notification Act (SORNA)[29] to the factfinder and were permissible matters in mitigation under R.C.M. 1001(c)(1)(B).

Our superior court has held that the consequences of sex offender registration are not a proper consideration for sentencing. *United States v. Talkington*, 73 M.J. 212, 216 (C.A.A.F. 2014) (addressing a military judge's instruction regarding an appellant's unsworn statement and observing that the proper focus of sentencing is on the offense and the character of the accused, and "to prevent the waters of the military sentencing process from being muddied by an unending catalogue of administrative information" (quoting *United States v. Rosato*, 32 M.J. 93, 96 (C.M.A. 1991)) (internal quotation marks omitted)). Although an appellant may reference sex offender registration in his unsworn statement, *id.* at 217 (citations omitted), we find no authority and Appellant cites none for the proposition that an appellant has an unfettered right to attach anything he wants to an unsworn statement and then have it marked as an exhibit and admitted into evidence, or otherwise presented to the factfinder, to determine an appropriate sentence.

---

[27] On 17 June 2015, the President signed Executive Order 13,696 ("2015 Amendments to the Manual for Courts-Martial, United States"). Exec. Order No. 13,696, 80 Fed. Reg. 35,783 (22 Jun. 2015).

[28] Appellant further claims he was deprived of due process and equal protection under the law, U.S. CONST. amend. V, because he was prohibited from including the attachments, and yet SB could discuss the "collateral consequences" of Appellant's crime through her unsworn victim impact statement. SB's victim impact statement addressed victim impact matters authorized by R.C.M. 1001A. We find this issue does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

[29] Sex Offender Registration and Notification Act, 34 U.S.C. §§ 20901–962, formerly 42 U.S.C. §§ 16901–991.

The plain language of R.C.M. 1001(c)(2)(C) allows for an unsworn statement given "by the accused," his counsel, or both. Consistent with the rule, the military judge did not preclude Appellant from commenting on sex offender registration requirements, which Appellant brought to the attention of the members in his verbal unsworn statement and again in a written unsworn statement that the military judge admitted as a Defense Exhibit. The DoDI appendix and journal article are neither a statement by Appellant nor by counsel on his behalf and are instead the statements of others. We conclude that the military judge did not abuse his discretion in excluding evidence of statements not written by Appellant, which contained inadmissible information about collateral consequences of a court-martial conviction.

### 4. Instruction on Sex Offender Registration

At trial, Appellant's counsel argued that the attachments at issue were "within the scope" of the permissible bounds of an unsworn statement and that, as with Appellant's own statements about sex offender registration, in due course the military judge would just instruct the members to disregard the attachments as part of their deliberations. Although the trial defense counsel did not object to the limiting instruction the military judge gave, on appeal Appellant claims the military judge erred in giving the instruction.[30]

While an appellant's right of allocution in presentencing may be very broad, a military judge may provide instructions to the members to limit his statements and place them in their proper context. *See United States v. Grill*, 48 M.J. 131, 133 (C.A.A.F. 1998). In *Talkington*, our superior court held that sex offender registration is a collateral consequence of the conviction alone and has no causal relationship to the sentence imposed for the offense. 73 M.J. at 216–17. Thus, while an accused is permitted to raise this collateral consequence in his unsworn statement, "the military judge may instruct the members essentially to disregard the collateral consequence in arriving at an appropriate sentence for an accused." *Id.* at 213 (citations omitted).

---

[30] Appellant's appellate counsel claims as an assigned error that the instruction, *inter alia*, "amounts to legal schizophrenia":

> On one hand the members are told that the Accused can bring unsworn "information" to their attention; on the other hand they are then instructed to ignore it versus giving it "appropriate consideration." The ultimate effect on the members, and thus the Accused, is that they received no coherent or consistent judicial guidance or "instructions."

Furthermore, Appellant claims the instruction was "simply erroneous as a matter of law" in reply to the Government's answer.

Appellant is resolute in his appeal that *Talkington* was wrongly decided and the military judge erred even if he "considered himself bound by it." Even so, *Talkington* holds that the military judge is authorized to place sex offender registration in its proper context by informing the members that it is permissible for an accused to address sex offender registration in an unsworn statement, while also informing them that possible collateral consequences of a conviction should play no part in their deliberations. *Id.* at 218 (citations omitted).

Considering the holding in *Talkington*, we find Appellant waived our review of the limiting instruction now complained of by making sex offender registration a key part of both unsworn statements, and conclude there is no error to correct on appeal. Whether an appellant has waived an objection to an instruction is a legal question that this court reviews de novo. *See Davis*, 2020 CAAF LEXIS 76, at *6–7 (findings instruction waived). In presentencing, the defense strategy was designed to highlight Appellant's understanding of having to register as a sex offender as a consequence of his conviction for sexual assault. When contesting the military judge's ruling on the inadmissible attachments, his counsel stated it was "so important" for Appellant to be able to "bring up [having to register as a sex offender] as a matter in his unsworn statement." A key argument the Defense made on this point was that collateral information should be permitted to be given to the members "understanding that [the members] are going to be given an instruction, essentially, to disregard [registration] as part of the[ir] deliberation[s]." To this end, Appellant reviewed the draft instructions at trial and was twice asked if there was any objection or request for additional instructions. Both times Appellant answered in the negative. On these facts, we find Appellant conceded to the instruction he now objects to on appeal. Appellant thus waived our consideration of the issue, *see id.*, and we determine to leave his waiver intact, *see Chin*, 75 M.J. at 223 (citation omitted).

### 5. Mandatory Dismissal Required by Article 56(b)(1), UCMJ

Appellant claims his sentence that included a dismissal required by Article 56(b)(1), UCMJ, 10 U.S.C. § 856(b)(1),[31] violates his right to equal protection under the Fifth Amendment.[32] Appellant argues that an officer who "stabs someone with a hunting knife" would not be required to be so punished, and it

---

[31] The NDAA for Fiscal Year 2014 modified Article 56, UCMJ, 10 U.S.C. § 856, and required that the punishment for, *inter alia*, violations of Article 120(b) "must include, at a minimum, dismissal or dishonorable discharge," subject to exceptions not relevant to Appellant's case. Pub. L. No. 113–66, § 1705(a)(1), 127 Stat. 672, 959 (2013).

[32] U.S. CONST. amend. V.

follows, Appellant contends, that his sentence that included a mandatory dismissal for sexual assault is "arbitrary, capricious, and unconstitutional."

We are unpersuaded by Appellant's analogy and find his sentence is not unconstitutional on grounds that his punishment included a mandatory dismissal. In *Chapman v. United States*, 500 U.S. 453, 467 (1991), the Supreme Court observed that a statutory sentencing scheme that eschewed "individual degrees of culpability . . . would clearly be constitutional." The Supreme Court noted a statute that imposed a fixed sentence for distributing any quantity of lysergic acid diethylamide (LSD), in any form, with any carrier, would be constitutional. *Id.* It follows that Congress has the power to require a minimum sentence for sexual assault as it does a fixed sentence for LSD. It also follows that whether Congress commanded a minimum sentence for an unrelated offense (e.g. homicide or assault) has no bearing on the constitutionality of a minimum sentence of a punitive discharge for sexual assault.

The Supreme Court explained that "[a] sentencing scheme providing for 'individualized sentences rests not on constitutional commands, but on public policy enacted into statutes.'" *Id.* at 467 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978)). "Congress has the power to define criminal punishments without giving the courts any sentencing discretion," and in fact, "[d]eterminate sentences were found in this country's penal codes from its inception." *Id.* (citations omitted). Although mandatory minimum sentencing schemes "fail to account for the unique circumstances of offenders who warrant a lesser penalty," the Supreme Court has nonetheless held them constitutional. *Harris v. United States*, 536 U.S. 545, 568–69 (2002), *overruled on other grounds by Alleyne v. United States*, 570 U.S. 99, 103 (2013) (any fact that increases the mandatory minimum must be submitted to the jury); *see also Harmelin v. Michigan*, 501 U.S. 957, 996 (1991) ("We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further.")

Article 56(b)(1), UCMJ, commands that Appellant's punishment must include, at a minimum, dismissal from the service. This is akin to Article of War 95, the predecessor of Article 133, UCMJ, 10 U.S.C. § 933, in which Congress originally provided that "[a]ny officer or cadet who is convicted of conduct unbecoming an officer and a gentleman shall be dismissed from the service," *United States v. Timberlake*, 18 M.J. 371, 377 (C.M.A. 1984) (Everett, C.J., concurring) (alteration in original). The law does not support Appellant's contention that a mandatory minimum sentence of a dismissal for sexual assault is unconstitutional on grounds that Congress has not proscribed the same minimum sentence for other crimes. We find no violation of equal protection under the Fifth Amendment from Congress' establishment of a minimum sentence for sexual assault.

### 6. Sentence Appropriateness

Appellant also claims his mandatory dismissal is inappropriately severe. We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ. Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

Appellant faced 30 years of confinement, but was sentenced to just six months, along with a mandatory dismissal, forfeiture of $1,000.00 pay per month for six months, and a reprimand. Appellant had known SB for only a few days after meeting her for the first time. We have given individualized consideration to Appellant, the nature and seriousness of his offense, his record of service, and all other matters contained in the record of trial, *see United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted), and conclude Appellant's sentence is appropriate. Although we have the authority to disapprove a mandatory minimum sentence required by Article 56, UCMJ, we decline to do so. *See United States v. Kelly*, 77 M.J. 404, 408 (C.A.A.F. 2018).

### F. Military Judge's Alleged Conflict of Interest

Appellant contends his conviction must be set aside because Judge Spath's undisclosed employment negotiations with the United States Department of Justice (DoJ) created a disqualifying appearance of bias. For support, Appellant relies on Judge Spath's denial of his continuance request and ruling that excluded two documents Appellant wanted to attach to his written unsworn statement, both discussed *supra*. We find Judge Spath was not disqualified from presiding as the military judge at Appellant's trial.

### 1. Additional Background

After Appellant's arraignment and initial Article 39(a), UCMJ, session ended on 12 July 2017, Judge Spath, in his capacity as the chief trial judge of the Air Force, detailed himself, on 26 September 2017, to preside at Appellant's court-martial and ordered trial to reconvene on 8 January 2018 at 0830 hours. Judge Spath replaced the previous military judge who had presided over Appellant's arraignment on 11 July 2017 and then retired from active duty. Judge

Spath himself was also preparing to retire to become an immigration judge employed by the DoJ.

Judge Spath applied for the DoJ position on 19 November 2015, well before Appellant's trial. As part of his application, he stated he had 5 years of experience as a trial judge and another 15 years of extensive experience as both a prosecutor and criminal defense counsel. He stated he "tried over 100 sexual assault cases" among other felony trials and, as a military judge, he "presided over close to 100 sexual assault trials, and another 50+ trials involving other violent crimes."

The DoJ extended an initial job offer to Judge Spath in March 2017, and in mid-June 2017 established an 18 September 2017 start date. Judge Spath negotiated his salary and start date in a series of emails, including emails between 27 March 2017 and 3 July 2017 that are attached to the appellate record. The job offer and its terms were pending when Appellant's trial reconvened on 8 January 2018 with Judge Spath presiding as the military judge.

### 2. Analysis

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999)). R.C.M. 902 outlines the circumstances when a military judge shall disqualify himself or herself in any proceeding. Two distinct grounds include when the "military judge's impartiality might reasonably be questioned," or the military judge has "an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding." R.C.M. 902(a), 902(b)(5)(B). "'Proceeding' includes pretrial, trial, post-trial, appellate review, or other stages of litigation." R.C.M. 902(c)(1).

When an appellant challenges a military judge's impartiality for the first time after trial, "'the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)). The appearance of impartiality is reviewed on appeal objectively and the military judge's conduct is tested to determine if it "would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982) (quoting E. Thode, *Reporter's Notes to Code of Judicial Conduct* 60 (1973)) (internal quotation marks omitted); *see also United States v. McIlwain*, 66 M.J. 312, 314 (C.A.A.F. 2008) ("Whether the military judge should disqualify herself is viewed objectively, and is 'assessed not in the mind of the military judge [her]self, but rather in the mind of a reasonable man

. . . who has knowledge of all the facts.'" (alterations in original) (quoting *United States v. Wright*, 52 M.J. 136, 141 (C.A.A.F. 1999))).

When the issue of disqualification is raised for the first time on appeal, we apply the plain error standard of review. *Martinez*, 70 M.J. at 157 (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

Appellant argues Judge Spath's "flaunting" of his experience as a judge advocate and military judge in his job application was disqualifying. In particular relevance to Appellant's case, he further claims "it is more than reasonable to logically infer" that (1) Judge Spath excluded two attachments that referenced sex offender registration consequences so as not to jeopardize his prospective DoJ employment; and (2) Judge Spath denied Appellant's motion for a continuance because he was clearing his docket in preparation to begin his immigration judge duties. We address each contention in turn.

First, we find no basis for disqualification in Judge Spath's job application or his negotiations with the DoJ. He described his trial and judicial experience by reference to his years of practice and the number and types of cases he tried. He did not gild his communications with DoJ personnel in a manner that could raise doubts about the legality, fairness, or impartiality of Appellant's trial— by boasting of, for example, a record of convictions or expediency in moving cases as a trial judge. Appellant draws parallels with the disqualifying interest Judge Spath was found to have in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), where he presided over Al-Nashiri's military commission. The United States Court of Appeals for the District of Columbia Circuit observed that judges may not sit in judgment on cases in which their prospective employers are a party:

> the Attorney General was a participant in Al-Nashiri's case from start to finish: he has consulted on commission trial procedures, he has loaned out one of his lawyers, and he will play a role in defending any conviction on appeal. The challenge [Judge] Spath faced, then, was to treat the Justice Department with neutral disinterest in his courtroom while communicating significant personal interest in his job application. Any person, judge or not, could be forgiven for struggling to navigate such a sensitive situation. And that is precisely why judges are forbidden from even trying.

*Id.* at 236–37 (citation omitted). Ultimately, the court found that "[Judge] Spath's job application, therefore, cast an intolerable cloud of partiality over his subsequent judicial conduct." *Id.* at 237.

But the circumstances of Appellant's court-martial are different than Al-Nashiri's military commission. The DoJ was not a party to Appellant's trial and did not have an identifiable interest in its result, nor was the Attorney General or anyone in the DoJ a participant. Neither the DoJ nor the Attorney General has a close association with military courts-martial generally, or Appellant's case specifically. Appellant cites one connection with the DoJ: Appellant claims the DoJ's role overseeing and administering the SORNA was disqualifying because of Judge Spath's "rulings on various SORNA issues litigated below." In fact, just one of Judge Spath's rulings tangentially related to SORNA—a ruling excluding two attachments that referenced sex offender registration Appellant wanted to give to the members as part of his written unsworn statement. However, the connection of this ruling and SORNA is tenuous. Judge Spath neither applied SORNA nor interpreted, much less undermined or reinforced, the Government's reliance on any provision. Rather, his ruling addressed the military presentencing procedures in R.C.M. 1001, a rule promulgated by the President, and related to the permissible bounds of an appellant's unsworn statement. There is no reason to believe that a DoJ hiring official would hear about the ruling and be pleased or displeased, or that Judge Spath believed a DoJ hiring official would be aware of his ruling or that it would be any matter of consequence. This case is therefore distinguishable from the disqualification found in *In re Al-Nashiri.*

Second, there is no evidence in the record that Judge Spath denied Appellant's continuance motion for personal reasons or that an objective observer knowing the facts would conclude that he did. No evidence or reasonable inference suggests that Judge Spath was under pressure to move Appellant's case hurriedly so that he could retire. As the chief trial judge, Judge Spath had plenary detailing authority which would have allowed him to identify any trial judge in the Air Force to preside at Appellant's trial if he concluded Appellant met his burden to show a continuance was warranted. *See* Air Force Manual 51-204, *United States Air Force Judiciary and Air Force Trial Judiciary*, ¶ 1.3 (18 Jan. 2008, Incorporating Through Change 2, 9 Oct. 2014) (the duties of the chief trial judge include "detailing judges to all Air Force General and Special courts-martial.").[33] Even if there was some evidence that Judge Spath was under pressure to keep a post-retirement timeline, and there is none, he could

---

[33] Superseded by Air Force Instruction 51-204, *United States Air Force Judiciary and Air Force Trial Judiciary*, ¶ 2.3.1 (10 Sep. 2018).

have detailed a judge other than himself to preside at Appellant's trial if a continuance was warranted.

We find Judge Spath was not disqualified from presiding at Appellant's court-martial. An objective observer knowing all of the facts would not question Judge Spath's impartiality, and there is no evidence in the trial or appellate record that Judge Spath had an interest that could be substantially affected by the outcome of the proceeding. *See* R.C.M. 902(a), 902(b)(5)(B). "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). Appellant has not overcome the presumption. We find no error, much less plain and obvious error, on this issue.

## G. Post-Trial

In the post-trial proceeding, Appellant was represented by both his CDC and military defense counsel, Captain (Capt) JK.[34] In an assignment of error raised by the CDC on Appellant's behalf, Appellant claims he was prejudiced by (1) the failure of the base legal office to serve the record of trial (ROT) and the staff judge advocate's recommendation (SJAR) on his CDC; and (2) the refusal by the convening authority's staff judge advocate to recall Appellant's case after the convening authority had taken action so that the convening authority would have the benefit of an Article 38(c), UCMJ, brief that the CDC submitted after the deadline to submit clemency. Appellant claims both procedural errors denied Appellant of his right to procedural due process.

In a related issue raised by Appellant, he argues his military defense counsel was ineffective because he failed to "adequately communicate to the government the role and status of [the] CDC in post-trial proceedings."[35] Appellant avers that both he and his CDC "communicated to [Appellant's] detailed military defense counsel the role that [the] CDC had been retained to play in post-trial processing, and submission of clemency and related matters to the convening authority." Appellant explains, "If my detailed military defense counsel in fact informed the legal office that my CDC was only acting as appellate counsel, as alleged by the government, that would be false and contrary to my express wishes."

---

[34] Capt JK promoted to major after trial.

[35] In response to an order of this court, Appellant's three appellate counsel identified military appellate counsel as "primary" counsel on the assignment of error that Appellant raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

### 1. Additional Background

In a final session of the court held on 11 January 2018 while the members deliberated on their sentence, the military judge conducted an inquiry with Appellant and one of his two detailed military defense counsel, Capt JK, to ensure Appellant had been advised both orally and in writing of his post-trial and appellate rights. The military judge asked Capt JK if he was "going to be responsible for post-trial processing?" Capt JK responded in the affirmative and submitted a post-trial rights advisement dated the first day of trial that Appellant and both military counsel had signed.

#### a. Capt JK's Clemency Submission on Behalf of Appellant

Capt JK actively represented Appellant after the members sentenced Appellant to a dismissal, to be confined for six months, to forfeit $1,000.00 of pay per month for six months, and to be reprimanded. On 16 January 2018, Capt JK sent a request to the convening authority to defer the adjudged forfeitures until action and waive mandatory forfeitures for a period of six months for the benefit of Appellant's dependent children. *See* Articles 57(a)(2), 58b(b), UCMJ, 10 U.S.C. §§ 857(a)(2), 858b(b).[36] Capt JK also certified the transcript, receipted for the SJAR, requested and received an extension to submit matters, and submitted his own attorney clemency memo identifying himself as Appellant's defense counsel.

In his 3 May 2018 attorney clemency memo, Capt JK responded to the SJAR dated 16 April 2018. On Appellant's behalf, Capt JK advocated the military judge erred in (1) denying Appellant's motion for a continuance to allow Appellant to be represented at trial by the CDC; (2) denying Appellant's motion to compel discovery of text messages between SB and her friend FK; and (3) denying a request by a court member to receive evidence of a statement Appellant made to the Brevard County (Florida) Sheriff's Office on grounds that the statement was hearsay and its probative value was outweighed by other considerations under Mil. R. Evid. 403.

Capt JK correctly informed the convening authority that his power "to modify the findings and sentence in [Appellant's] case is greatly restricted." He noted the convening authority had the power to reduce or set aside the adjudged confinement, forfeitures, and reprimand, but could not set aside the

---

[36] On 19 January 2018, the convening authority denied the request to defer adjudged and mandatory forfeitures, and, effective 25 January 2018, granted waiver of $1,000.00 of the mandatory forfeitures for a period of six months, upon expiration of Appellant's term of service, or until release from confinement, whichever was sooner, to be paid for the benefit of Appellant's dependent children.

findings of guilty or disapprove the dismissal. Capt JK asked the convening authority to grant clemency by disapproving the $1,000.00 forfeitures for six months and to reduce Appellant's confinement by 32 days. Along with the relief Capt JK requested as clemency,[37] Capt JK asked the convening authority to write a letter in support of Appellant's claims of error. As entreated, the letter would advocate that the convening authority would have set aside the findings or ordered a new trial if he had the power to do so; it also would have recommended that the Secretary of the Air Force (SECAF) substitute an administrative discharge for the dismissal as authorized by Article 74(b), UCMJ, 10 U.S.C. § 874(b).

Appellant's own submission, also dated 3 May 2018, echoed the clemency and other relief Capt JK requested on Appellant's behalf. Appellant requested the convening authority to "consider the letter from [his] Defense Counsel, Capt [JK]" along with other matters that were submitted in clemency. He also discussed the consequences of the mandatory dismissal and sex offender registration. Five days later, on 8 May 2018, the convening authority took action and denied the clemency and other relief that Appellant and Capt JK had urged the convening authority to grant. There is no evidence in the record or reason to believe that the convening authority wrote the letter to the SECAF that Appellant and Capt JK asked for, much less favored either outcome Appellant sought.

### b. Conduct of Counsel in Appellant's Post-Trial Representation

Appellant's CDC learned that the convening authority took action a week after it happened. In a sworn affirmation to this court, the CDC provided emails exchanged with Capt JK, and with personnel at the base legal office who tried the case and the convening authority's legal staff. The CDC explained he received the SJAR sometime on 15 May 2018, when he learned the convening authority had already taken action, but did not receive a copy of the authenticated ROT he needed to finalize an Article 38(c), UCMJ, brief to identify legal errors to the convening authority.[38]

---

[37] *See* Article 60(b)(1), UCMJ, 10 U.S.C. § 860(b)(1) ("The accused may submit to the convening authority matters for consideration by the convening authority with respect to the findings and the sentence."); *see also* R.C.M. 1105(b)(1) ("The accused may submit to the convening authority any matters that may reasonably tend to affect the convening authority's decision whether to disapprove any findings of guilty or to approve the sentence, except as may be limited by R.C.M. 1107(b)(3)(C).").

[38] Appellant's CDC avers he did receive a copy of the "*unauthenticated* ROT for the January 2018 proceedings."

In response to the CDC's affirmation and Appellant's claims of ineffective assistance of his military defense counsel, the Government provided declarations from the assistant trial counsel and the chief of military justice on the convening authority's legal staff. Additionally, we ordered and received a declaration from Capt JK. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam). Pared down to the relevant facts, the post-trial affirmation, declarations, and attachments thereto are generally consistent and indicate the following facts.

After sentencing, the CDC and Capt JK ultimately resolved that both attorneys would represent Appellant in seeking clemency and other relief from the convening authority, and the CDC would represent Appellant in his appeal. Each attorney undertook to prepare and separately submit matters to the convening authority. Capt JK would assist Appellant with his personal clemency request and submit it along with a supporting attorney memorandum that Capt JK would prepare and sign. At the same time the CDC would prepare and submit an Article 38(c), UCMJ, brief, that identified errors in Appellant's trial.

Legal office personnel at the base where the case was tried and on the convening authority's staff had a different understanding. Above all, their actions show they relied on Capt JK's acknowledgement at trial that he was responsible for post-trial processing. The Government attorneys believed that Capt JK alone was responsible for representing Appellant on post-trial matters and that Appellant's CDC would be representing Appellant on appeal. Their beliefs were reinforced by two important facts evident from the declarations: first, that Appellant's CDC did not send a notice of representation to the Government or formally countermand Capt JK's acknowledgement on the record that Capt JK would handle post-trial processing; and second, Appellant identified his CDC as appellate counsel on AF Form 304, *Request for Appellate Defense Counsel*, on the day his court-martial adjourned. The understanding of the Government's attorneys apparently did not change when Capt JK, on 13 April 2018 and on the CDC's behalf, requested the legal office to make a copy of the authenticated ROT and send it to the CDC. Capt JK's request did not specify whether the CDC needed the ROT for the purpose of clemency, appeal, or some other purpose. Capt JK had been provided his own copy for use while preparing the response to the SJAR. *See* R.C.M. 1106(f)(3).

On 16 April 2018, and in accordance with R.C.M. 1106(f)(2), the legal office served Capt JK, by email, with the SJAR. Appellant receipted for his copy of

the SJAR on 18 April 2018.[39] Appellant's CDC was not served with the SJAR. Capt JK erroneously believed the legal office would provide Appellant's CDC with a copy guided by the misunderstanding that the Government had a "responsibility to provide this type of document to all defense counsel involved in the post-trial process." Not coincidentally, the CDC asserts as much in this appeal.

Appellant had a ten-day period to submit clemency. *See* R.C.M. 1105(c)(1). As the 28 April 2018 deadline drew near, Capt JK "continued to work on [his] attorney memorandum for [Appellant]'s clemency submission" and "worked with [Appellant] on his clemency letter and was in communication with [Appellant's CDC]." Capt JK's "communication with [Appellant's CDC] included emailing [Appellant]'s draft clemency letter with [Capt JK's] suggestions for his input. This was done at [Appellant]'s request and was emailed to [Appellant's CDC] on 20 April 2018." There is nothing in the post-trial declarations to suggest that the CDC asked Capt JK to provide, or that Capt JK did provide, the SJAR he received by email from the Government.[40]

Capt JK "talked to [Appellant's CDC] about [Appellant]'s approaching clemency submission deadline." Even though Appellant's CDC supposed he would receive a copy of the SJAR from the Government and had not received one himself, nonetheless, on 24 April 2018, the CDC asked Capt JK to request an extension from the convening authority to allow for additional time to submit matters. Capt JK avers he had separate telephone conversations with two attorneys in the base legal office and let them know he "would be requesting an extension for [Appellant]'s clemency submission." He told one of the attorneys that the justification for the request was "due in part to [Capt JK's] workload and leave and in part for [Appellant's CDC] *who would also be submitting matters* for [Appellant]'s clemency." (Emphasis added). This is the first and only clear indication in the post-trial declarations that anyone in the Govern-

---

[39] Appellant receipted for a copy of the record of trial on 17 April 2018.

[40] Included as an attachment to the affirmation of Appellant's CDC is an email he sent to a judge advocate on the convening authority's staff stating the CDC "received a copy of the SJAR from [Capt JK on 15 May 2018] when [Capt JK] found out that [the CDC] had not been served with a copy." We decline to speculate why one counsel did not share the SJAR with the other between 16 April 2018 and 3 May 2018, the date clemency was submitted. However, the SJAR was apparently of no consequence to the CDC's part of the representation as neither defense counsel aver that the CDC asked Capt JK to send him a copy.

ment should have been aware that Appellant's CDC expected to submit matters separate from the submission the Government expected to receive from Appellant and Capt JK.[41]

On the other hand, Capt JK's written extension request to the convening authority and his staff judge advocate (SJA) made no mention that more time was needed for Appellant's CDC to submit matters. It also did not reference that Appellant's CDC had not received an authenticated copy of the ROT or a copy of the SJAR and that more time was needed for the CDC's review of those documents. And, unlike Capt JK's verbal conversation with an attorney from the base legal office, his written request that was approved by the SJA to the convening authority—who was not the supervisor of the base legal office personnel whom Capt JK spoke to on the telephone—did not mention that Appellant's CDC was preparing a separate submission and also needed an extension. Rather, the request asked the Government for a delay until Friday, 4 May 2018 at 1630 hours because Capt JK simply needed "more time to speak with [Appellant] and coordinate with [Appellant's] civilian counsel." The extension was granted with a new deadline of 4 May 2018; significantly, on 25 April 2018, Capt JK informed the CDC of the new deadline.

On 2 May 2018, Capt JK let Appellant's CDC know he was prepared to submit Appellant's clemency matters with his accompanying attorney memorandum the next day so that the convening authority's legal staff would have it before 4 May 2018. Capt JK informed the CDC that he would ensure the CDC was copied on the submission so that the CDC would have the contact information for the attorneys at the base legal office and know to whom he should send his Article 38(c), UCMJ, brief.

True to Capt JK's intention to meet the 4 May 2018 deadline, on 3 May 2018, Capt JK's paralegal submitted Capt JK's attorney clemency memo along with Appellant's personal clemency submission. Appellant's CDC was copied on the email, which read, "Please see attached clemency request for [Appellant] and feel free to contact our office with any questions." Thereafter, neither the CDC, nor Capt JK on the CDC's behalf, alerted the Government that the submission was incomplete as the CDC intended to submit a brief. Capt JK avers

---

[41] The CDC avers he:

> personally communicated with the Assistant *Trial* Counsel [ATC] the fact that he needed a copy of the RoT, which the ATC agreed to provide and CDC provided his office mailing address to him, as CDC was going to be submitting matters for the [staff judge advocate] and [convening authority]'s post-trial consideration in this case . . . .

It is unclear from the CDC's affirmation what exactly the CDC communicated to the ATC other than he required a copy of the record of trial.

he "believed that [Appellant's CDC] would subsequently be submitting his Article 38[(c), UCMJ,] brief to them before the clemency deadline." In a memorandum for record Capt JK composed on 21 June 2018 that was attached to his declaration, Capt JK states "[i]t was not until on or about 14 May 2018, that [he] learned [Appellant's CDC] did not submit his brief since he was waiting for the ROT and SJAR to be served to him from the legal office." Coincidentally, Appellant was released from confinement on 14 May 2018.

In the days that followed, Appellant's CDC was unsuccessful in convincing the Government to withdraw the action and recall Appellant's case so that the convening authority would have the benefit of his Article 38(c), UCMJ, brief. Appellant's record of trial was docketed with this court on 22 May 2018. On 30 May 2018, this court received a memorandum from the Air Force Legal Operations Agency, Military Justice Division, Appellate Records Branch (AFLOA/JAJM), identifying the CDC's 40-page brief dated 14 May 2018 for inclusion in the original record of trial.[42] The JAJM memorandum was signed as having been received by representatives of the Appellate Government Division (JAJG) and the Appellate Defense Division (JAJA). The brief is included in the record of trial.

### 2. Law

"The standard of review for determining whether post-trial processing was properly completed is de novo." *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63 (C.A.A.F. 2000)). An error in post-trial processing results in material prejudice to the substantial rights of an appellant under Article 59(a), UCMJ, 10 U.S.C. § 859(a), if an appellant "makes some colorable showing of possible prejudice." *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998) (quoting *United States v. Chatman*, 46 M.J. 321, 323–34 (C.A.A.F. 1997)). Given our superior court's reliance on "the highly discretionary nature of the convening authority's clemency power, the threshold for showing prejudice is low." *United States v. Lee*, 52 M.J. 51, 53 (C.A.A.F. 1999).

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984).

---

[42] A second document included with the brief was a 3-page memorandum regarding "Excess Appellate Leave Issues" that was signed by Appellant's CDC, which the court accepted for inclusion in the record of trial.

*Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)).

We review allegations of ineffective assistance of counsel de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009)). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient" and that this deficiency resulted in prejudice. *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). Accordingly, we consider "whether counsel's performance fell below an objective standard of reasonableness." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted). An appellate court must "evaluate the combined efforts of the defense as a team rather than evaluating the individual shortcomings of any single counsel." *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004) (citing *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001)).

**3. Analysis**

All too often we see careless mistakes by government attorneys and defense counsel during post-trial processing. But this is the unusual case where an appellant and his civilian counsel fault the Government and the military defense counsel for the CDC's own missed deadline—one that the military defense counsel timely requested in part on the CDC's behalf and the CDC knew had been granted. Still, resolution of Appellant's assigned errors are straightforward even if the reasons underlying the failures in communication on Appellant's team are peculiar. Pared down to the relevant facts, the declarations reveal the Government complied with standards applicable to post-trial processing, and Appellant has shown neither deficiency in the combined performance of his defense counsel nor a colorable showing of possible prejudice by the convening authority taking action without the benefit of the Article 38(c), UCMJ, brief the CDC had prepared.

Rule for Courts-Martial 1106(f)(2) lists the order of precedence on whom the SJAR is served if an accused fails to designate a specific counsel at trial. The SJAR is served on one counsel only, and civilian counsel is first in the order of precedence if an accused does not so designate. Because Capt JK identified he was counsel of record for post-trial processing, the order of precedence is inapplicable, and the Government met its obligation under R.C.M. 1106(f)(2) by serving the SJAR on Capt JK and him alone. *See United States v. Washington*, 45 M.J. 497, 498 (C.A.A.F. 1997) (finding error after appellant requested his military counsel be served with the SJAR and ROT, but service was accomplished on appellant's civilian counsel instead). There is no evidence in the record of proceedings—or indication in any declaration or affirmation—that the CDC sent notice of representation to the Government that might have changed

this designation or the understanding of any legal office personnel.[43] On these facts it was not error for the Government to refuse to withdraw the action after faithfully observing the R.C.M. 1106(f)(2) procedures and granting in full Appellant's request for an extension to submit matters.

Appellant had a 4 May 2018, 1630 hour deadline to submit clemency, which both defense counsel knew had been extended once. Each counsel undertook a well-defined responsibility. Capt JK capably met his. Despite asking Capt JK to request an extension and knowing a new deadline had been set, Appellant's CDC did not submit his Article 38(c), UCMJ, brief or request a second extension so that his brief would be timely.[44] Once the clemency deadline passed, Government attorneys could reasonably conclude Appellant's clemency submission was complete: the matters the Government did receive, which the CDC also received because the defense paralegal included him on the email, made no reference to a separate submission that would be forthcoming from the CDC. For these reasons, we find the Government did not err in post-trial processing and Appellant was not denied his right to procedural due process.

Even if we presume deficiency of the defense team, *see Garcia*, 59 M.J. at 450, we find no colorable showing of possible prejudice, *see Wheelus*, 49 M.J. at 289, and thus no grounds to order post-trial processing anew. The convening authority had the power to reduce or set aside Appellant's adjudged confinement, forfeitures, and reprimand, but could not set aside the findings of guilty or disapprove the dismissal. Consistent with these restrictions, and citing the power the convening authority did have under Article 60, UCMJ, 10 U.S.C. § 860, Capt JK's submission asked the convening authority to disapprove the $1,000.00 forfeitures for six months and to reduce Appellant's confinement by 32 days. His request was in harmony in all respects with the relief Appellant wanted and the clemency the convening authority had the power grant.

---

[43] Appellant faults his military defense counsel for failing to make clear to the Government that the scope of the CDC's representation included preparing a post-trial submission to the convening authority. We find this was the CDC's responsibility, and his alone, and is customarily done by sending notice to an adverse party that defines the scope of the representation undertaken by the attorney. As discussed previously, the military judge also found Appellant's CDC did not enter a formal appearance during trial, even after receiving a retainer fee.

[44] Appellant's CDC could have asked the convening authority to push the deadline to 18 May 2018. *See* R.C.M. 1105(c)(1) ("If, within the 10-day period [to submit matters], the accused shows that additional time is required for the accused to submit such matters, the convening authority or that authority's staff judge advocate may, for good cause, extend the 10-day period for not more than 20 additional days.").

In contrast to Capt JK's submission, the Article 38(c), UCMJ, brief is silent about clemency and advocates for relief that the convening authority had no power to grant. Its focus, much like Appellant's appeal to this court, are errors Appellant claims occurred at trial. Appellant's CDC advocated for retrial on grounds that Appellant was denied the right to be represented by his civilian counsel of choice. He advocated for the findings and sentence to "be disapproved and reversed, as constitutionally invalid" and that Appellant's "sentence herein should be set aside and a rehearing as to an appropriate sentence for this Accused, ordered." The convening authority did not have the power to do these things.[45] Appellant's CDC did not address, as Capt JK did, either the power the convening authority did have or the clemency Appellant asked the convening authority to grant.

More to the point, although Appellant's Article 38(c), UCMJ, brief identifies errors, it does not seek clemency or any other relief the convening authority might have given. Even so, Appellant's CDC argues "prejudice *per se*" and remand for post-trial processing anew because the action "fails to acknowledge that the Military Judge ordered that [Appellant] be credited with 16 days of pretrial confinement in the Brevard County [Florida] Jail." (Second alteration in original). This too misses the mark. The convening authority's action was not incomplete because the convening authority must only include credit for *illegal* pretrial confinement in the action. R.C.M. 1107(f)(4)(F). The action was thus proper without stating the 16 days of administrative credit Appellant was due. In fact Appellant was properly credited with these days on the DD Form 2707-1, *Department of Defense Report of Result of Trial*, which is included in the record of trial with the confinement order. Further, Appellant's CDC notes in his Statement of the Case as part of his Article 38(c), UCMJ, brief that Appellant had been released from confinement on 14 May 2018 after serving a six-month sentence that began on 11 January 2018.

Because Capt JK submitted clemency on Appellant's behalf and his request was clemency Appellant sought and the convening authority could grant, this is not a case where an appellant was effectively without representation during the post-trial process and prejudice is presumed. *See United States v. Knight*, 53 M.J. 342 (C.A.A.F. 2000) (citations omitted).

We evaluate trial defense counsel's performance not by the success of their strategy, *see United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)), but by an objective standard of reasonableness. *Gutierrez*, 66 M.J. at 331 (citations

---

[45] *See* R.C.M. 1102 (proceedings in revision and Article 39(a), UCMJ, post-trial sessions); R.C.M. 1107(e) (ordering rehearing or other trial); R.C.M. 1210 (new trial); *see generally* Articles 60(f) and 73, U.C.M.J, 10 U.S.C. §§ 860(f), 873.

omitted). Having evaluated the combined actions of both defense counsel in their post-trial representation of Appellant, *see Garcia*, 59 M.J. at 450, we find their performance as a whole did not fall below applicable standards even though the convening authority took action without the benefit of the Article 38(c), UCMJ, brief.

## H. Remaining Allegations of Ineffective Assistance of Counsel

After Appellant submitted his assignments of error and the Government answered, Appellant submitted a declaration pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), personally setting forth nine allegations of ineffective assistance of counsel by the two military defense counsel who represented him at trial. One of the counsel, Capt JK, assisted Appellant in post-trial processing as described above. In response to Appellant's claims, we ordered and received declarations from both trial defense counsel, which refute Appellant's claims and are generally consistent with one another. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See Ginn*, 47 M.J. at 248; *DuBay*, 37 C.M.R. at 413.

As discussed previously, Appellant personally alleges that the military defense counsel who represented him in clemency was ineffective in that he failed to adequately communicate with Appellant's retained CDC and the Government regarding post-trial representation and the desire of the CDC to submit matters in clemency. In addition, Appellant contends that his military defense counsel were ineffective in eight assignments of error, which we considered and summarily resolve here. Appellant declares his second team of detailed military defense counsel failed to: (1) investigate the alleged offense; (2) challenge the Government's denial of Appellant's request for investigative assistance; (3) refrain from dissuading Appellant that hiring an investigator at personal expense was not necessary or worthwhile; (4) make timely objections at trial; (5) challenge the general prohibition on using the good-soldier defense and offer evidence and present argument of a good-soldier defense; (6) present photographs or a to-scale floor plan of the scene of the alleged crime; (7) advise Appellant of the advantages of taking the stand in his own defense; and (8) clarify and preserve the record regarding the retention of civilian defense counsel.[46]

We find these issues do not require further discussion and are without merit. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We further

---

[46] Although Appellant was represented by two former detailed military defense counsel when the deficiencies underlying the first three of these alleged errors occurred, Appellant claims ineffective representation from his second defense team only.

conclude from our review of the record and all post-trial declarations that Appellant was neither deprived of a fair trial nor was the trial outcome unreliable. *See Strickland*, 466 U.S. at 696. Accordingly, we find Appellant's claims of ineffective assistance of counsel do not warrant relief.

## I. Timeliness of Appellate Review

We review de novo whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

Appellant's case was originally docketed with the court on 22 May 2018. The overall delay in failing to render this decision by 22 November 2019 is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy post-trial review and appeal. Analyzing the *Barker* factors, we find the delay is not excessively long. The reasons for the delay include the time required for Appellant to file his brief on 23 July 2019, and the Government to file its answer on 5 September 2019. After Appellant's reply on 30 September 2019, ten days later on 10 October 2019, Appellant submitted a declaration identifying nine allegations of ineffective assistance of counsel, which the Government answered on 2 January 2020, and Appellant replied on 14 January 2020. We granted 12 enlargements of time—11 for Appellant and 1 for the Government—resulting in the scheduling of a status conference with all appellate counsel before a panel judge. This court issued 11 orders, ruled on 6 out-of-time filings submitted by Appellant and 1 from the Government, and returned 4 of Appellant's filings with no action for non-compliance with this court's Rules of Practice and Procedure.

The court affirms the findings and sentence in this case after carefully examining numerous assignments of error, including nine alleged deficiencies of Appellant's trial defense counsel that the parties had not completed briefing by 22 November 2019, after which date the appellate delay was facially unreasonable. *See id.* However, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See United*

*States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). As a result, there is no due process violation. *See id.* In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court